UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIMOTHY HOOD, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | 1:05-cv-1484-RLY-WTL |
| ) | |
| OFFICER MARTIN KOELLER, OFFICER ) | |
| GREGORY DAVIS, SERGEANT DAN ) | |
| HERRICK, individually and in their ) | |
| representative capacities, FRANK ) | |
| ANDERSON, in his official capacity as ) | |
| Marion County Sheriff, and the MARION ) | |
| COUNTY SHERIFF'S DEPARTMENT, ) | |
|     Defendants. ) | |

**ENTRY DENYING MOTION FOR SUMMARY JUDGMENT**

Gregory Davis, at all times relevant to the litigation a Corporal with the Marion County Sheriff's Department, works with the canine unit. On October 11, 2003, he and a canine partner were dispatched to the home of Plaintiff, Timothy Hood, following a report of domestic violence. Along with other officers, Davis attempted to coax the Plaintiff from his location in the attic above the home's garage, but was unable to do so. Eventually, he and the canine went up to the attic and, after further attempts to coax Plaintiff from his hiding place, Davis let his canine partner loose to find and subdue Timothy Hood to effect his arrest. That job was accomplished, but not without serious injury to Hood as a result of the canine latching on to Hood's arm. Hood was arrested and eventually taken to the hospital where he spent the next nine days recovering and receiving a skin graft.

Hood filed this lawsuit against Officer Davis and two other officers who were on the scene, Officer Martin Koeller and Sergeant Dan Herrick. In addition, Hood sued Frank Anderson as Marion County Sherriff and the Marion County Sheriff's Department. He claims the officers used undue force in obtaining his arrest, in violation of his constitutional rights and 42 U.S.C. § 1983. He claims Sheriff Anderson and the Sheriff's Department are liable under state law negligence and *respondeat superior* theories. A motion was filed on behalf of all the Defendants, seeking the entry of summary judgment as a matter of law. In response, Plaintiff has admitted that his state law claims and his claims against the Sheriff and the Sheriff's Department lack sufficient evidentiary support. Therefore, the court has no reason to discuss those claims further and summary judgment will issue. However, Hood claims that questions of material fact prevent the entry of summary judgment in favor of any of the individual officers on his § 1983 claim. Consequently, the remainder of this entry will address the continued viability of Plaintiff's § 1983 claim against the individual officers.

**Summary Judgment Standard**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving parties entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving parties must show there

is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (reversing summary judgment for defendant in excessive force case).

**Undisputed Facts**

On October 11, 2003, Timothy Hood and his wife, Cindy Hood, returned home after a night on the town, during which both consumed enough alcohol to inspire a heated argument between them. While the extent of violent behavior which accompanied the argument remains a question of fact, Cindy Hood was able to dial 911 and Officer Martin Koeller was dispatched by the Marion County Sheriff's Department with advice that he was responding to a domestic violence situation.

When Officer Koeller arrived, he saw someone through the window running

toward the back of the house.  He was greeted at the door by Cindy Hood, who seemed very upset.  Believing Mr. Hood was headed toward the back door of the house, Koeller ran to the rear of the home where, upon arrival, he heard noise coming from the garage.  After conversing with Cindy Hood, Koeller understood that Timothy Hood had gone into the garage and then up into the attic of the garage.  Further discussion with Mrs. Hood led to Officer Koeller's belief that Timothy Hood had fled to the attic after having engaged in an argument that included his throwing files and objects around the home office, grabbing his wife by her hair and shoving her into a wall, pulling the phone cord from the phone and kicking in the locked bedroom door, where Cindy had fled to call the police and where he further accosted Mrs. Hood before Officer Koeller arrived on the scene.

     Sergeant Dan Herrick arrived on the scene after Officer Koeller.  On his way to the scene, Herrick learned from radio contact with Officer Koeller that someone had run toward the back of the house upon the officer's arrival.  Based on his belief that it was likely that a domestic battery subject may be trying to flee, Sergeant Herrick radioed Corporal Davis and asked that he and his canine partner come to the scene.  When Sergeant Herrick arrived at the Hood home, Officer Koeller related what he had learned from Mrs. Hood and confirmed that he had found the phone cord had been ripped from the phone, the home office area was a mess and the bedroom door had been kicked in.  With assistance from Cindy Hood, the two officers determined that the only access to the attic was via a pull-down ladder in the garage.  While the officers were in the garage, they could hear objects being slid or moved around on the attic floor.  After some discussion

the officers pulled down the attic ladder and Sergeant Herrick yelled up at Mr. Hood, announcing that the Sheriff's Department was on the scene and Hood needed to come down from the attic. Sergeant Herrick says that he yelled up to the attic several times over a ten to twelve minute period and also announced several times that a canine unit was on the way.

Officer Davis arrived on the scene and joined the other officers in the garage. He was informed that Mr. Hood was in the attic and that he was wanted for domestic battery, battery and interfering with the reporting of a crime. After a discussion with Mrs. Hood, and prior to proceeding up to the attic, Officer Davis was working with an understanding that the factual circumstances included the following:

1) There was only one way to and from the attic and that was the pull-down ladder;
2) The attic contained numerous furniture pieces, was cluttered and provided several places where a person could hide;
3) The other officers had yelled up to the attic several times and requested that Timothy Hood surrender and come down, but received no response;
4) Timothy Hood had been arrested in the past for domestic battery and fled the scene on another occasion when officers had been called to the house.

Officer Davis put his canine partner on a six foot lead and stood at the base of the ladder and yelled to the attic that he was with the canine unit, that Hood should surrender or Davis and the dog would begin a search that could result in Hood being bitten. He repeated the warning a second time after several minutes passed without a response. He then led the dog to the attic, while Officer Koeller joined Cindy Hood in the kitchen. The attic was dark and cluttered. Davis commanded the dog to heel and then announced again

that he was with the canine unit and, unless Hood surrendered immediately, he would begin a search with the dog and Hood could be bitten. Davis pulled his flashlight out and surveyed the area, noting that there was "a shotgun or long gun of some type lying on top of a mattress which was leaning against the far wall." With no response coming from Hood, Davis feared that he was waiting to ambush or may have weapons, so he released the dog to conduct the search. The dog bit Timothy Hood on his left arm as he was lying behind a mattress. [1]

Hood struggled with the dog as it bit him, screaming for someone to get the dog off of him. While Hood struggled, Davis commanded him to show his hands so he could be sure he was unarmed. Eventually, Davis got both Hood and the dog under control, but not until Hood had suffered severe skin and tendon damage from his encounter with the canine. Officer Koeller came to the ladder to assist Hood down and Officer Davis went to examine the gun he had seen and discovered it was a BB rifle. Medics came to the

---

[1] Timothy and Cindy Hood signed affidavits submitted by Plaintiff which provided some contradiction to statements contained in the affidavits of the three officers who are Defendants in this lawsuit, from which most of these facts have been garnered. However, the Hood affidavits were not sworn and also contained patent misstatements; so, via previous order, the court required the Plaintiff to resubmit sworn affidavits prior to any decision being made on the pending summary judgment motion. Plaintiff resubmitted his own sworn and corrected affidavit, but was unable to obtain another affidavit from Cindy Hood, purportedly due to her discontent with matters related to the couple's divorce. Without contradiction from a sworn affidavit of Cindy Hood, the court can certainly treat most of what the officers relate in their sworn affidavits as undisputed, unless contradicted by Mr. Hood's affidavit. Nevertheless, the court notes that the unsworn affidavit of Cindy Hood includes statements to the effect that the response time between her call and the arrival of the police was approximately 15 minutes, Mr. Hood had gone to the attic by the time the officers arrived, she stood alone in the kitchen adjacent to the garage while the officers were talking and engaging in the search and she never heard the officers warn that Mr. Hood may be bitten.

scene ad transported Hood to the hospital.

Timothy Hood was charged with four misdemeanors, all of which were eventually dropped. He claims he had passed out in the attic after fighting with his wife and never heard any of the directions, orders or warnings given by the officers. He says he woke to a dog biting him on the arm and never made any effort to flee or resist arrest. Hood further states that he has never owned a gun, BB or otherwise, and that there were no firearms whatsoever in the attic. He spent nine days in the hospital following his arrest a and had skin grafts to cover the wound to his left arm.

**Discussion**

Timothy Hood's claim is one of excessive force, the use of which can violate a person's Fourth Amendment rights and present the basis for damages under 42 U.S.C. § 1983.[2] *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Acevedo v. Cantebury*, 457 F.3d 721, 724 (7th Cir. 2006). When examining whether excessive force has been used in executing an investigatory stop or arrest, the fact finder must balance the intrusion to the individual with the government interests at stake. *Graham*, 490 U.S. at 396. It is a reasonableness standard which is incapable of precise definition or mechanical application and requires careful reference to the circumstances existing at the time the particular action at issue was taken. *Id.*

---

[2] Hood has admitted in his response brief that he has no claim under the Fourteenth Amendment as initially alleged.

The right to make an arrest carries with it a right to use some degree of physical coercion to effect it. *Id.*; *see also, Johnson v. LaRabida Children's Hosp.,* 372 F.3d 894, 898 (7th Cir. 2004). The question is one of degree and must be accessed under the totality of the circumstances at hand. This requires consideration of the severity of the crimes allegedly committed, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396.

Defendants claim that the force used was not excessive as a matter of law and, regardless, they are entitled to qualified immunity. In *Saucier v. Katz*, 533 U.S. 194, 200 (2001) the Supreme Court set forth the two-part test for determining if qualified immunity applies to shield a defendant from suit. First, a court must ask whether, "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, if the facts alleged would make out a constitutional violation, then a court must face the inquiry of whether it would be clear to a reasonable officer that the conduct complained of was unlawful in the situation he encountered. *Id.* 202. Again, it is important to note that it is the situation the officer confronted *as described by the facts most supportive to the injured party*.

In the case at bar, if the facts were exactly as described by the Plaintiff, with it being easy to discern that he was asleep and uninformed of the dog's presence, with no weapon in the vicinity and his posing no potential danger to anyone, then the use of a canine to roust him from his sleep would be a violation of his right to be free from

unreasonable search and seizure.  Under an objective analysis, any officer who releases a trained police dog to subdue a suspect knows that he is directing the use of force that is much more likely to inflict serious injury than other methods,  *See Smith v. City of Hemet,* 394 F.3d 689, 704 (9th Cir. 2005), and has some obligation not to deploy the dog unreasonably.  *Kuha v. City of Minnetonka*, 365 F.3d 590, 598-99 (8th Cir. 2003); *Vathekan v. Prince George's County,* 154 F.3d 173, 178-79 (4th Cir. 1998).  Consequently, qualified immunity is not available to all the Defendants as a matter of law.

However, not all the Defendants are similarly situated.  Sergeant Herrick and Officer Koeller were not in the attic at the time the dog was released.  Plaintiff argues that an officer on the scene who fails to intervene when he knows that a suspect's constitutional rights are about to be violated by another officer and he could reasonably prevent it, is liable under 42 U.S.C. § 1983.  Citing *Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994), Hood maintains that there is a question of fact which prevents the award of summary judgment in favor of Herrick or Koeller.  The court disagrees.  What must be examined is the conduct complained of by Hood.  Unlike with Officer Davis, who actually gave the command to the dog which resulted in Hood's injury, Sergeant Herrick and Officer Koeller merely assisted Davis and his dog in entering the attic.  There is no evidence indicating that either knew that the circumstances were such in the attic that Officer Davis would never need to release the dog to locate or subdue the suspect.  The Court of Appeals in *Yang* indicated that an officer would need to have reason to know

that excessive force was being used or that a constitutional violation was in the process in order to have an obligation to intervene. *Id*. at 285. So, whether their actions are examined with qualified immunity as the issue or ultimate liability, the actions of Defendants Herrick and Koeller did not violate Hood's constitutional rights.

What remains as a question of fact for the jury is whether or not Corporal Davis used reasonable force when subduing and effecting the arrest of Timothy Hood. That question turns on the circumstances in the attic at the time. Evidence in support of Plaintiffs case is somewhat wanting. In light of his testimony that he was asleep and never heard any police warnings, he has been put, or put himself, in a tough position. Nevertheless, the circumstances are not such that Officer Davis is entitled to summary judgment. There are facts which still need to be sorted out and could fall in the Plaintiff's favor. As Hood argues, it seems that all the officers at the scene knew that there was no way for him to flee or hurt anyone else as long as he was in the attic. Further, the court's curiosity is peeked by why any weapon seen in the attic was not retrieved as evidence. And, while the officers had reason to believe that several crimes had been committed and that there may have been some physical violence associated with those crimes, there was no indication that Hood was armed or dangerous. Were there time constraints here? Was there any reason for Davis to suspect that Hood may have passed out drunk in the attic, or was the volume and number of verbal warnings, both before and after Davis and his canine partner made it up to the attic, such that it would be unreasonable for anyone to claim not to have heard them?

**Conclusion**

There are enough factual questions still to be resolved to prevent the entry of summary judgment in favor of Defendant Officer Gregory Davis with respect to Timothy Hood's claim of Davis's use of excessive force in violation of Hood's Fourth Amendment rights and 42 U.S.C. § 1983.  All of Plaintiff's other claims fail as a matter of law.  Accordingly, Defendants' Motion for Summary Judgment (Docket # 26) is **DENIED** with respect to Plaintiff's claim under 42 U.S.C. §1983 against Defendant Officer Gregory Davis.  The motion is **GRANTED** with respect to all other Defendants and all other claims raised in Plaintiff's Complaint.

**SO ORDERED** this 18th day of May 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Lakshmi Devi Hasanadka
OFFICE OF CORPORATION COUNSEL
lhasanad@indygov.org

Robert D. King Jr.
rking@kingandrogers.com